*In The*
**United States Court of Appeals**
*For the*
**Third Circuit**

_____

*Case No. 17-3207*

TOWNSHIP OF BORDENTOWN, NEW JERSEY, AND CHESTERFIELD TOWNSHIP, NEW JERSEY, AND PINELANDS PRESERVATION ALLIANCE

*Petitioners*,

V.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

*Respondent*,

-AND-

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

*Intervenor-Respondent.*

*On Joint Petition for Review of Permits Issued by*
*The New Jersey Department of Environmental Protection*
*(Agency Permit Nos. 0300-15-0002.2 FWW150001, 1322D DWP150001, 0300-15-0002.2*
*FHA150001, and 0300-15-0002.2 FHA150002)*

**BRIEF OF INTERVENOR-RESPONDENT,**
**TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC.**

*Christine A. Roy, Esq.*
New Jersey Bar No. 020631992
Rutter & Roy, LLP
3 Paragon Way, Suite 300
Freehold, New Jersey 07728
Phone: (732) 462-1990;
Fax: (732) 462-1993
E-mail: CRoy@rutterroy.com

*Richard G. Scott, Esq.*
New Jersey Bar No. 030642010
Rutter & Roy, LLP
3 Paragon Way, Suite 300
Freehold, New Jersey 07728
Phone: (732) 462-1990
Fax: (732) 462-1993
E-mail: RScott@rutterroy.com

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES……………………………………..……...    iv

CORPORATE DISCLOSURE STATEMENT………………………….    ix

STATEMENT OF JURISDICTION……………………………………..    1

STATEMENT OF THE ISSUES PRESENTED……………….………..    4

STATEMENT OF RELATED CASES AND PROCEEDINGS………....    5

STATEMENT OF THE CASE….………………………….……………    8

    1.    The Project…………………………...……………………….    8

    2.    The FERC Process………………………………………….....    9

    3. New Jersey's Permitting Process……………………………    11

        A.  The FWW Permit………………………………………    12

        B.  The FHA Permit and FHA Verification………………..    16

        C.  The Temporary Dewatering Permit……………………    17

    4. Adjudicatory Hearing Requests………………………………..    17

STANDARD OF REVIEW……………………………………..…………    18

SUMMARY OF ARGUMENT…………………………….…………....    20

I.     THE NJDEP APPROPRIATELY DENIED BORDENTOWN'S
REQUESTS FOR ADJUDICATORY HEARINGS…………….    22

II.    NJDEP COMPLIED WITH THE FWPA AND IMPLEMENTING
REGULATIONS AND PROPERLY ISSUED THE FWW
PERMIT………………………………………………………….    26

# TABLE OF CONTENTS (Cont'd)

Page

    A.    NJDEP's Determination That the Project Was In the Public's Interest Was Proper Since the Project Was Certificated by FERC…………………………………… 26

    B.    NJDEP Analyzed Alternative Sites For the Electrical Substation In Compliance With the FWPA and The Clean Water Act…………................................................... 32

III.    THE NJDEP WAS UNDER NO LEGAL OBLIGATION TO CONSIDER THE CUMULATIVE ENVIRONMENTAL IMPACTS OF NJNG'S SRL PROJECT……………...………….. 38

    A.    The NJDEP Did Not Segment its Review of Transco's Project and the SRL…………………….......................... 38

    B.    The Environmental Impacts of the SRL are Irrelevant to the NJDEP's Review of Transco's Permit Application…………………………………………….. 41

CONCLUSION……………………………………………………. 42

CERTIFICATE OF ADMISSION TO THE BAR…………………... 43

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)……………………………….. 44

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE OF APPELLATE PROCEDURE 31.1(C)…………………...…………. 45

CERTIFICATE OF SERVICE……………………………………. 46

# TABLE OF AUTHORITIES

Page

*Federal Cases*

*Alliance For Legal Action v. U.S. Army Corps of Engineers*
    314 F.Supp.2d 534 (M.D.N.C. 2004)……………………………     32
*American Rivers, Inc. v. F.E.R.C.*
    129 F.3d. 99 (2d  Cir. 1997)………………………………....     3
*Bell v. New Jersey*
    461 U.S. 773 (1983)………………………………………...     22
*Bennett v. Spear*
    520 U.S. 154 (1997)………………………………………...     23
*Berkshire Envtl. Action Team, Inc. v. Tennessee Gas Pipeline
Company, LLC*
    851 F.3d 105 (1st Cir. 2017)……………………………….     23, 24,
                                                      25
*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*
    419 U.S. 281 (1974)………………………………………...     19
*Burlington Truck Lines v. United States*
    371 U.S. 156 (1962) ……………………………………....     19
*Chevron U.S.A., Inc. v. Natural Res. Defense Council*
    467 U.S. 837 (1984)…………………………………………     19
*Darby v. Cisneros*
    509 U.S. 137 (1993)………………………………………...     24
*Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*
    833 F.3d 360 (3d Cir. 2016) …………………………….…..     2, 3, 12,
                                                      18, 19,
                                                      22, 30
*Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*
    870 F.3d 171 (3d Cir. 2017) …………………………….…..     22, 23,
                                                      41
*Del. Riverkeeper Network v.  v. U.S. Army Corps. Of Eng'rs*
    869 F.3d 148 (3d. Cir. 2017) …………………………….…     33, 34,
                                                      37
*Ford Motor Credit Co. v. Milhollin*
    444 U.S. 555 (1980)………………………………………..     19
*Frisby v. U.S. Dep't of Hous. & Urban Development*
    755 F.2d 1052 (3rd Cir. 1985)…………………………………     19
*Hillsdale Environmental Loss Prevention Inc. v. U.S. Army Corps of
Engineers*
    702 F. 3d 1156 (10th Cir. 2012)………………………..……     34

iii

# TABLE OF AUTHORITIES (Cont'd)

Page

*Hoosier Environmental Council v. U.S. Army Corps of Engineers*
 722 F.3d 1053 (7th Cir. 2013)…………………………………….   28
*Islander East Pipeline v. Conn. Department of Environmental*
*Protection*
 467 F.3d 295 (2d Cir.2006)……………………………………   27
*Motor Vehicle Mfrs. Assn. of United States v. State Farm Mut.*
*Automobile Ins. Co.*
 463 U.S. 29 (1983) ……………………………………………   18
*National Wildlife Federal v. Whistler*
 17 F.3d 1341 (8th Cir.1994)…………………………………...   19
*SBC Inc. v. FCC*
 414 F.3d 486 (3rd Cir. 2005)……………………………………..   19
*Schneidewind v. ANR Pipeline Co.*
 485 U.S. 293 (1988) ……………………………………………..   27
*Tennessee Gas Pipeline Co. LLC v. Del. Riverkeeper Network*
 921 F. Supp.2d 381 (M.D.Pa. 2013)………………………………   25
*Thomas Jefferson Univ. v. Shalala*
 512 U.S. 504 (1994)…………………………………………...   19
*Utahns for Better Transp. v. U.S. Dept. of Transp.*
 305 F.3d 1152 (10th Cir. 2002)……………………………………   32, 41

**Federal Statutes**

5 U.S.C. § 706 (2)(A) ………………………………………….   18
15 U.S.C. § 717r(d)1……...……………………………………..   1, 18, 23, 25
33 U.S.C. § 1341(a)(1)………………………………………….   1, 11
33 U.S.C. § 1341(d)……………………………………………..   2
33 U.S.C. § 1344………………………………………………..   2, 3
33 U.S.C. § 1344(a)……………………………………………..   11

**State Statutes**

*N.J.S.A.* 13:9B-1……...……………………………………….   12
*N.J.S.A.* 13:9B-11…………………………………………….   26

# TABLE OF AUTHORITIES (Cont'd)

Page

### *State Regulations*

314 *CMR* 9.09(1)(e)……………………………………………….    23
314 *CMR* 9.10(1)…………………………………………………..    23
33 *N.J. Reg.* 3045(a)…………………………………………………..    12
*N.J.A.C.* 7:7A-1.3……………………………………………...……..    39
*N.J.A.C.* 7:7A-2.1(c)……………………………………...……..    12
*N.J.A.C.* 7:7A-2.1(d)…………………………………..……..    2, 12
*N.J.A.C.* 7:7A-10.1(c)……………………………...………    39
*N.J.A.C.* 7:7A-10.2(b)1…………………………………..    33, 38
*N.J.A.C.* 7:7A-10.2(b)12…...…………………………..    26
*N.J.A.C.* 7:7A-10.2(b)12i-vii…………………………...…..    27
*N.J.A.C.* 7:7A-10.2(b)12iv…...……………………..……..    29
*N.J.A.C.* 7:7A-10.2(c)1...…..…………………………..    33
*N.J.A.C.* 7:7A-10.3(b)...…………………………………..    33
*N.J.A.C.* 7:7A-10.3(c)1…...…..………………………..    34
*N.J.A.C.* 7:7A-19.5(a)……...…………………………..    2
*N.J.A.C.* 7:7A-21.3………………………………………..    24
*N.J.A.C.* 7:13-5.2………………………………………..    2
*N.J.A.C.* 7:13-5.5(a)……………………………………...    2
*N.J.A.C.* 7:19-2.13………………………………….…..    24

### Other Sources

155 FERC ¶61,016 (April 7, 2016)………………………………..    8, 9, 10, 28
157 FERC ¶61,095 (November 9, 2016)………………………...    10
Memorandum of Agreement between the New Jersey Department of
Environmental Protection and Energy and the United States
Environmental Protection Agency (1993)………………………    12

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and
Statement of Financial Interest**


No. _____



v.



<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.


(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, _____

makes the following disclosure:                                        (Name of Party)

       1) For non-governmental corporate parties please list all parent corporations:

       2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

       3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

       4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

_____                    Dated: _____
(Signature of Counsel or Party)

**rev: 09/2014**                              (Page 2 of 2)

# STATEMENT OF JURISDICTION

This Court has original and exclusive jurisdiction over the Joint Petition for Review pursuant the Natural Gas Act ("NGA"), 15 U.S.C. § 717r(d)(1). Specifically, 15 U.S.C. § 717r(d)(1) provides the United States Courts of Appeals with "original and exclusive jurisdiction" over the review of "an order or action of a … State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval" to interstate natural gas pipeline companies for projects subject to regulation by the Federal Energy Regulatory Commission ("FERC"). *Id*.

Here, Bordentown Township, Chesterfield Township, and the Pinelands Preservation Alliance (collectively, "Petitioners") filed a Joint Petition for Review on October 11, 2017, challenging the New Jersey Department of Environmental Protection's ("NJDEP") issuance of a Freshwater Wetlands Protection Act Individual Permit ("FWW Permit"), Flood Hazard Area Control Act Individual Permit ("FHA Permit"), Flood Hazard Area Verification ("FHA Verification"), and Temporary Dewatering Permit to Transcontinental Gas Pipe Line Company, LLC ("Transco") in connection with Transco's Garden State Expansion Project ("Project"). As previously held by this Court, FWW Permits are granted pursuant to federal law, as theses permits constitute the Water Quality Certificate ("WQC") under Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a)(1), and the dredge and fill permit under Section 404 of

the Clean Water Act, 33 U.S.C. § 1344. *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d 360, 369-70 (3d Cir. 2016); *N.J.A.C.* 7:7A–2.1(d); *N.J.A.C.* 7:7A–19.5(a).

This Court also held that it had jurisdiction over the review of the FHA Permit, even though that permit, in and of itself, is not a delegated permit under federal law. This Court reasoned:

> Given that the Freshwater Wetlands Individual Permit constitutes both the Section 404 permit and the Water Quality Certification, and that, under Section 401 of the Clean Water Act, "any other appropriate requirement of state law set forth in [the] certification" will be treated as a condition on the federal permit affected by the certification—in this case, the Section 404 permit.

*Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d at 373 (quoting 33 U.S.C. § 1341(d)). To that end, this Court held that it had jurisdiction over Transco's FHA Permit "as conditions set forth in the Water Quality Certification." *Id.* In addition, this Court would have jurisdiction over the FHA Verification as it is integral to the issuance and review of the FHA Permit. S*ee N.J.A.C.* 7:13–5.5(a)(the flood hazard area design flood elevation, and floodway limit, where present, must be known and verified within the project area pursuant to *N.J.A.C.* 7:13-5.2 in order for the [NJDEP] to determine compliance with the requirements of [the Flood Hazard Area Control Act] and issue an authorization under a general permit or an individual permit."). Similar to the Letter of Interpretation at issue in *Del. Riverkeeper Network*

2

*v. Sec'y, Pa. Dep't of Envntl. Prot.*, the FHA Verification is "part and parcel" of the FHA Permit, and subject to this Court's review. *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d at 373.

Insofar as the Temporary Dewatering Permit is a condition of the FWW Permit, this Court also has jurisdiction over the Temporary Dewatering Permit. Specifically, the FWW Permit condition provides that prior to Transco beginning construction it must have first obtained the Dewatering Permit. *See* JA, Vol. I, 8 (FWW Permit, Pre-Construction Condition #2). The condition further provides that, in the event "the Dewatering Permit requires amendments to [the FWW Permit], [Transco] must secure all such amendments as part of its pre-construction conditions." *Ibid.*[1]

Accordingly, this Court has jurisdiction over the Joint Petition for Review.

---

1 The NJDEP also included a special permit condition which essentially sets forth the pertinent terms of the settlement of the condemnation action filed by Transco against Bordentown Township (in which the NJDEP was also named as an interested party) for permanent and temporary easements across Township-owned property that is Green Acres restricted. *See* JA, Vol I., 8 (FWW Permit). These permit conditions have no nexus to water quality and thus are not an "appropriate requirement" of state law. *See* 33 U.S.C. § 1341(d); *see also American Rivers, Inc. v. F.E.R.C.*, 129 F.3d 99, 107 (2d Cir. 1997)(noting that "Section 401(d)[ 33 U.S.C. § 1341(d)], reasonably read in light of its purpose, restricts conditions that states can impose to those affecting water quality in one manner or another"). In fact, two different divisions within the NJDEP reviewed and issued the FWW Permit and the Temporary Dewatering Permit. However, these permit conditions are not being challenged in this appeal.

## STATEMENT OF THE ISSUES PRESENTED

1.   Whether, consistent with the express language of the NGA, this Court has original and exclusive jurisdiction over a petition challenging an action of a state administrative agency acting pursuant to federal law to issue a Water Quality Certification under Section 401of the Clean Water Act ("CWA") and a permit under Section 404 of the CWA for an interstate natural gas pipeline?

2.   Whether the NJDEP appropriately relied on the FERC's issuance of the Certificate of Public Convenience and Necessity ("FERC Order" or "Certificate Order") to Transco for its determination that Transco's Project was in the public interest.

3.   Whether the NJDEP appropriately determined under the Freshwater Wetlands Protection Act ("FWPA") that there were no practicable alternatives to the location of Transco's proposed electrical substation which would have had less impacts on the aquatic ecosystem?

4.   Whether the NJDEP was required to analyze the impacts of New Jersey Natural Gas' Southern Reliability Link in reviewing Transco's permit applications?

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

There have been a number of related cases and proceedings, which are listed below:

1.    *People Over Pipelines Inc., et al v. State of New Jersey Department of Environmental Protection*, United States Court of Appeals for the Third Circuit, Docket Nos. 17-1786 and 17-1788.  Appeals of the Freshwater Wetlands Protection Act Individual Permit and Dewatering Permit issued by NJDEP to Transco for the Project.  The Petitions for Review in these cases were dismissed on November 24, 2017 for failure to prosecute.

2.    *Township of Bordentown, et al v. Federal Energy Regulatory Commission*, United States Court of Appeals for the Third Circuit, Docket No. 17-1047.  The Townships of Bordentown and Chesterfield are challenging FERC's issuance of a Certificate of Public Convenience and Necessity.  The case has been fully briefed.

3.    "Motion for Stay by Bordentown and Chesterfield Townships" filed with FERC (Docket No. CP15-89-000) on March 29, 2017.  The Townships of Bordentown and Chesterfield in New Jersey (the "Townships") are seeking a stay of the March 24, 2017 Letter Order granting Transco's request for a Notice to Proceed with construction of the Project.  The motion remains pending before FERC.  No request for rehearing has been filed as to the Letter Order.

4.      *Transcontinental Gas Pipe Line Company, LLC v. 0.100 Acres of Land*, No. 1:16-cv-4413-RBK (D.N.J.).  Transco filed this condemnation action against property owned by Bordentown Township ("Bordentown") for the taking of permanent and temporary easements needed in connection with the Project.  The Honorable Robert B. Kugler, U.S.D.J. entered an Order for Condemnation (Doc. 30) on February 16, 2017 granting the easements condemned to Transco.  The parties consented to going through the Green Acres diversion process for the limited purpose of settling the issue of compensation.  Should that process be unsuccessful, the parties may return to court for the determination of just compensation.

5.      *Transcontinental Gas Pipe Line Company, LLC v. 1.613 Acres of Land*, No. 1:16-cv-9368-RBK (D.N.J.).  Transco filed this condemnation action for the taking of the fee of a portion of property owned by the New Jersey Turnpike Authority.  The Honorable Robert B. Kugler, U.S.D.J. entered an Order for Condemnation (Doc. 9) on February 7, 2017 granting the fee interest condemned to Transco.  The parties entered into a consent order settling the case.

6.      *Transcontinental Gas Pipe Line Company, LLC v. Township of Chesterfield*, No. 1:16-cv-05680-RBK (D.N.J. Mar. 21, 2017).  Transco filed suit against the Township of Chesterfield ("Chesterfield") seeking declaratory and injunctive relief in connection with Chesterfield's denial of construction permits to Transco on zoning and other grounds.  On March 21, 2017, the Honorable Robert B. Kugler, U.S.D.J. entered an

Order and Judgment (Doc. 33) declaring that state and local ordinances and regulations that affect the siting, construction, or operation of Transco's pipeline project are preempted by federal law and constitute an undue burden on interstate commerce. The parties entered into a stipulation of dismissal, which was signed by Judge Kugler on June 5, 2017.

7.      *Township of Chesterfield v. Transcontinental Gas Pipe Line Company, LLC*, BUR-L-660-17 (Superior Court of New Jersey, Burlington County, Law Division). Chesterfield filed suit against Transco alleging various forms of fraud, breach of contract, and breach of the covenant of good faith and fair dealing arising out of Transco's purchase of property from Chesterfield in connection with the Project. Chesterfield filed a Voluntary Stipulation of Dismissal with Prejudice on May 26, 2017.

## STATEMENT OF THE CASE

### 1.    The Project

Transco proposed to construct and operate the Project in order to provide 180,000 dekatherms per day ("Dth/d") of firm natural gas transportation capacity to New Jersey Natural Gas ("NJNG"). The Project will allow NJNG to access additional supplies of natural gas and benefit the consuming public by providing enhanced reliability and resiliency to NJNG's service territory in Monmouth and Ocean Counties, New Jersey. Transco has entered into a binding agreement with NJNG for the entire capacity of the Project. *See Transcontinental Gas Pipe Line Company, LLC*, 155 FERC ¶ 61,016 at ¶8 (April 7, 2016) ("FERC Certificate Order").

The Project was constructed in two phases. For Phase 1, Transco constructed a new meter and regulating station ("M&R Station") in Chesterfield and tied it into Transco's existing Trenton Woodbury Line. Generally, M&R stations allow pipeline companies to measure all natural gas entering or exiting their pipeline system. In addition to the construction of the M&R Station, Transco uprated an existing motor to 25,000 horsepower ("hp") and made related ancillary modifications at its Compressor Station 205 in Lawrence Township, New Jersey. *See Transcontinental Gas Pipe Line Company, LLC*, Order Issuing Certificate, 155 FERC ¶61,016 at ¶ 5. Phase 1 was placed in service on September 9, 2017, and will allow Transco to deliver up to 20,000

Dth/d to NJNG.  Transco's Addendum at T21 (Letter from Transcontinental Gas Pipe Line Company, LLC to FERC).

For Phase 2, Transco constructed a new compressor station known as Station 203, consisting of a single 30,500 hp electric motor driven unit and communication tower, both at the site of the M&R Station. Transco also constructed an electrical substation on a nearby property in Chesterfield in order to power Station 203. Additionally, Transco replaced two existing 16,000 hp compressor units and uprate electric motors each to 16,000 hp along with making related ancillary modifications at Compressor Station 205.  155 FERC ¶ 61,016 at ¶6.  On March 16, 2018, FERC authorized Transco to place Phase 2 in service, thereby allowing Transco to deliver the full 180,000 Dth/d of capacity to NJNG.  Transco's Addendum at T23 (FERC Letter Order).

## 2.    The FERC Process

On February 18, 2015, pursuant to provisions of the NGA, Transco applied to FERC for authority to construct and operate the Project. *See* 155 FERC ¶ 61,016 at ¶1. On November 4, 2015, in accordance with NEPA, FERC issued, in its Docket No. CP15-89-000, an EA for the Project.  *Id*. at ¶35.  In the EA, FERC analyzed the environmental impacts of the Project, including impacts to wetlands and water resources, vegetation and wildlife, air quality, and geology and soils.  FERC also considered comments submitted by other federal and state agencies along with

comments from members of the public.  FERC ultimately concluded in the EA that, by implementing the various mitigation measures outlined in the EA, the Project would not result in any significant environmental impacts.  *Id*. at ¶42.

After developing an EA for the Project and receiving additional comments from other federal, state and local entities, and members of the public, FERC ultimately granted Transco the Certificate on April 7, 2016, conditionally authorizing the construction of the Project and requiring that Transco place all facilities in service within two years of the date of the Order.  *See* 155 FERC ¶ 61,016 at ¶149(B)(1).  The Certificate Order conditioned Transco's authority to begin construction on it first obtaining "all applicable authorizations required under federal law."  *Id*. at ¶8.

On May 9, 2016, the Townships filed with FERC requests for rehearing of FERC's issuance of the Certificate and a stay of construction activity associated with the Project.  On June 8, 2016, FERC denied the Townships' request for a stay and, in a separate order, granted rehearing of the Certificate for the limited purpose of giving itself additional time to further consider the rehearing requests.  FERC ultimately denied the Townships' requests for rehearing on November 9, 2016.  *See Transcontinental Gas Pipe Line Company, LLC*, Order Denying Rehearing, 157 FERC ¶61,095 (Nov. 9, 2016) ("Rehearing Order").

The Townships subsequently filed an appeal of the Certificate and Rehearing Order to this Court on January 6, 2017 in Docket # 17-1047.  On March 24, 2017, after

Transco had obtained its FWW Permit and Temporary Dewatering Permit, FERC issued to Transco a Notice to Proceed ("NTP"), authorizing Transco to begin construction of the Project. As noted above, Transco placed the phase 1 facilities in service on September 9, 2017, and FERC has authorized Transco to place phase 2 in service.  Transco's Addendum at T19-23.

### 3.    New Jersey's Permitting Process

As is generally the case, the FERC Order required Transco to "file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof)."  Certificate Order, Appendix ¶8. Among the federal authorizations required for the Project is a Section 404 permit under the Federal Water Pollution Control Act (commonly known as the Clean Water Act), which authorizes the discharge of dredged or fill material into navigable waters.  33 U.S.C. § 1344(a).  Furthermore, pursuant to Section 401 of the Clean Water Act, an applicant for a Section 404 permit to construct or operate a facility that may result in a discharge to navigable waters must provide the federal permitting agency with "a certification from the State in which the discharge originates . . . that any such discharge will comply with" applicable state water quality standards. 33 U.S.C. § 1341(a)(1).

As this Court has noted, "New Jersey has assumed authority to issue Section 404 permits and delegated administration of the permitting program to NJDEP, which

11

exercises this authority pursuant to the New Jersey Freshwater Wetlands Protection Act." *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d at 369 (citing *N.J.S.A.* 13:9B-1 *et seq.*; 33 N.J. Reg. 3045(a); *N.J.A.C.* 7:7A-2.1(c); and Memorandum of Agreement between the New Jersey Department of Environmental Protection and Energy and the United States Environmental Protection Agency (1993)). A permit issued by the NJDEP pursuant to the FWPA also constitutes the water quality certificate required under Section 401 of the Clean Water Act. *N.J.A.C.* 7:7A-2.1(d).

### A.     The FWW Permit

On July 24, 2015, Transco submitted applications to the NJDEP for a FWW Permit, FHA Permit and FHA Verification. JA, Vol. II, 404 (Review & Decision Summary). During the pendency of the NJDEP's review of the FWW Permit, several environmental groups, members of the public, and Petitioners requested that the NJDEP hold a public hearing on Transco's FWW Permit application. *Id.* An initial hearing was scheduled for August 22, 2016, but was canceled due to high turnout and limited seating at the venue. *Id.* The NJDEP ultimately held two public hearings on October 13 and October 17, 2016 in Bordentown, New Jersey. *Id.* On November 10, 2016, Transco provided the NJDEP with a response to public comments document that addressed the comments made at the public hearings. JA, Vol. II, 268 (Letter and Comment Response Matrix).

Shortly thereafter, on November 17, 2016, the NJDEP provided Transco with a letter requesting additional information based on comments received at the public hearings. JA, Vol. II, 284. The NJDEP requested, among other things, additional documentation regarding the alternative locations referenced in Transco's FWW Permit application, and noted that "[t]hese locations appear to provide practicable and suitable locations for the project that would impact fewer wetlands and waters." *Id*. The NJDEP requested additional justification from Transco as to why those sites were not chosen as the preferred site. *Id*. Not only did the NJDEP request that Transco provide additional justification as to the siting of the entire project, but it asked that Transco consider relocating the electrical substation, the component that involved the greatest amount of impacts to wetlands, to an upland area. *Id*.

Transco responded to the NJDEP's requests by letter dated, December 2, 2016, providing a robust analysis of Project site alternatives and alternatives to the siting of the electrical substation. JA, Vol. II, 286. As to the alternate electrical substation sites, Transco analyzed two alternatives: (1) co-locating the electrical substation on the same property as the compressor station and M&R station; and (2) an alternate site directly across County Road 528 from the preferred site of the electrical substation at mile post ("MP") 15.2 NE ("Alternate 15.2 NE"). JA, Vol. II, 312-314.

Transco explained that co-locating the electrical substation with the other Project facilities would pose a number of logistical constraints and would therefore not be

13

practicable. For one, Transco pointed to constraints associated with being able to safely bring power from PSE&G's transmission line to the substation, and minimum clearances between Project facilities needed for safety. JA, Vol. II, 313. Transco further explained that co-locating all Project facilities on the same property would also have greater impacts to forested wetlands. *Id.*

As to Alternate 15.2 NE, Transco noted that this site is made up of several properties owned by the New Jersey Turnpike Authority. Although Transco noted that the site did not contain mapped wetlands or waterbodies, mapped scrub-shrub wetlands were present on the immediately adjacent property. JA, Vol. II, 312. Transco also explained that siting the electrical substation at Alternate 15.2 NE would double the length of the electric conduit duct-bank. *Id.*

On December 22nd, Transco's environmental consultant delineated the wetlands on the Alternate 15.2 NE site to confirm the location and boundaries of wetlands in accordance with the methodology set forth in the Federal Manual for Identifying and Delineating Jurisdictional Wetlands, as specified in the FWPA regulations. *See* JA, Vol. II, 353 (January 13, 2017 letter to NJDEP). As a result, Transco was able to determine that the Alternate 15.2 NE site is subject to several forested wetlands, which are of a higher ecological value than the modified agricultural wetlands on Transco's preferred site. *See Id.*

14

Based on the results of the wetlands survey, Transco applied the footprint of the electrical substation and electrical conduit to the Alternate 15.2 NE site. In so doing, Transco was able to compare the impacts associated with the alternate site with those of the preferred site. *See* JA, Vol. II, 355. Transco provided its results to the NJDEP in a letter dated January 13, 2017, ultimately concluding that, given impacts to the higher value forested wetlands on the Alternate 15.2 NE property, siting the electrical substation at that property would have a greater impact on the aquatic ecosystem, and, coupled with significant impacts to forested upland areas, would have other significant adverse environmental consequences. JA, Vol. II, 354. Transco informed the NJDEP that Alternate 15.2 NE would not be a practicable alternative with less environmental impacts. JA, Vol. II, 359.

Subsequent to Transco's submittal, the NJDEP performed an onsite inspection of the Alternate 15.2 NE property with Transco to confirm Transco's findings regarding the presence of wetlands. *See* JA, Vol. II, 361 (February 3, 2017 letter from Transco to the NJDEP). As a result of that inspection, the NJDEP requested that Transco further revise its design on the Alternate 15.2 NE property to avoid and minimize wetlands impacts. *Id*. Transco submitted a letter to the NJDEP, dated February 3, 2017, analyzing the impacts of shifting the electrical substation on the Alternate 15.2 NE property further into upland areas and away from wetlands. Transco determined, however, that, even with shifting the footprint of the electrical

15

substation, there would still be significant impacts to higher quality forested wetlands and forested upland areas. JA, Vol. II, 363.

Ultimately, the NJDEP concurred with Transco's analysis, and concluded that construction of the electrical substation on the Alternate 15.2 NE property would have greater environmental impacts over the preferred site. JA, Vol. II, 408 (Review & Decision Summary). While the NJDEP acknowledged that the preferred site of the electrical substation had slightly greater total impacts to wetlands, the NJDEP found that the alternate site would result in significantly greater impacts to forested wetlands, which the NJDEP found were of a greater ecological value than the modified agricultural wetlands on the preferred site. *Id*.

The NJDEP granted Transco the FWW Permit on March 13, 2017, conditioned (among other things) on Transco also obtaining the Temporary Dewatering Permit.

### B.   The FHA Permit and FHA Verification

As noted above, Transco applied for the FHA Permit and FHA Verification at the same time it applied for the FWW Permit. The NJDEP ultimately approved the FHA Permit and Verification on January 13, 2016. *See* JA, Vol. II, 404 (Review & Decision Summary). However, due to subsequent changes in the Flood Hazard Area Control Act regulations, which reduced the riparian zone applicable to the Project location, Transco was able shift its facilities out of the riparian zone. *See Id*. On March 13, 2017, Transco relinquished its FHA Permit. JA, Vol. II, 582 (letter from

Transco to the NJDEP relinquishing FHA Permit). However, Transco did not relinquish the FHA Verification. *Id*.

C.    The Temporary Dewatering Permit

On December 7, 2015, due to the expected need to perform dewatering activities during construction of the Project, Transco also applied for a Temporary Dewatering Permit. JA, Vol. II, 410 (Temporary Dewater Permit Application). On April 26, 2016, the NJDEP's Division of Water Supply and Geoscience held a public hearing on Transco's application. JA, Vol. II, 573 (Hearing Officer's Report). The NJDEP ultimately granted Transco the Temporary Dewatering Permit on March 21, 2017. JA, Vol. I, 18.

4.    **Adjudicatory Hearing Requests**

Petitioners each filed adjudicatory hearing requests in early March 2016 in connection with the issuance of FHA Permit. *See* JA, Vol. I, 34 (Order Denying Requests for Adjudicatory Hearing and Request for Stay). Bordentown Township filed adjudicatory hearing requests in connection with the FWW Permit and Temporary Dewatering Permit on March 22, 2017 and April 11, 2017, respectively. Bordentown Township also requested a stay of the FWW Permit in connection with its adjudicatory hearing request. *See Id*. Chesterfield Township and the Pinelands Preservation Alliance joined Bordentown Township's hearing request for the FWW Permit on April 21, 2017 and March 23, 2017, respectively. *See Id*.

17

On August 22, 2017, the Commissioner of the NJDEP issued an *Order Denying Requests for Adjudicatory Hearing and Request for Stay*. JA, Vol. I, 33. In the Order, the Commissioner, citing this Court's decision in *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d 360, 377 (3d Cir. 2016), held that "the administrative process provided for in the Freshwater Wetlands Protection Act is not applicable to permits for interstate natural gas pipeline projects", and that this Court has exclusive jurisdiction over the issuance of the permits. JA, Vol. I, 39 (citing 15 U.S.C. § 717r(d)(1)). The Commissioner also held that the permits were final upon issuance by the NJDEP. *Id.*

## STANDARD OF REVIEW

State action pursuant to the Clean Water Act is reviewed by this court under the arbitrary and capricious standard. *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d at 377. Under this standard, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The scope of review under the "arbitrary and capricious" standard is "narrow, and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. of the United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). An action is arbitrary and capricious only if the agency "failed to

examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 42–43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156 (1962). The court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974). An agency is due "substantial deference" under the arbitrary and capricious standard, and the validity of the agency's action is presumed. *SBC Inc. v. FCC*, 414 F.3d 486, 496 (3d Cir. 2005). The Court has a responsibility to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc.*, 419 U.S. at 286. The burden of proof rests with the party challenging the agency action. *See Frisby v. U.S. Dep't of Hous. & Urban Development*, 755 F.2d 1052, 1055 (3d Cir. 1985).

Furthermore, substantial deference is given to an agency's interpretation of statutes it administers, and particularly to its own regulations, so long as the interpretation is a permissible one. *See Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 844 (1984); *National Wildlife Federal v. Whistler*, 17 F.3d 1341, 1344 (8th Cir.1994); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). However, the Court will review *de novo* a state agency's interpretation of federal law. *Del.*

*Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.*, 833 F.3d at 377.

## SUMMARY OF ARGUMENT

The NJDEP appropriately denied Petitioners' requests for an adjudicatory hearing. The NJDEP's decision to issue the Permits to Transco constituted the culmination of the agency's review of Transco's applications, and was a final action subject to appeal in this Court pursuant to the NGA.

As to the NJDEP's findings and conclusions, Petitioners are only challenging the NJDEP's issuance of the FWW Permit, not the Temporary Dewatering Permit or FHA Permit. Even so, Petitioners have failed to establish that the NJDEP's issuance of the FWW Permit was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and their Joint Petition for Review should be denied. The NJDEP appropriately relied on the FERC's issuance of the Certificate Order in determining that Transco's Project is in the public interest, and, contrary to Petitioners' claims, considered the relevant factors under the FWPA regulations.

Furthermore, the NJDEP conducted a thorough analysis of alternate sites for the electrical substation, and appropriately determined that there were no practicable alternate sites with less impacts on the aquatic ecosystem. In fact, the alternate site referenced by Petitioners, Alternate 15.2 NE, was not even considered by Transco as part of its FERC application, and was only addressed as part of the FWW Permit

20

application when the NJDEP requested that Transco consider that specific site. Alternate 15.2 NE was thoroughly vetted by Transco and the NJDEP, and the record supports the NJDEP's determination that Alternate 15.2 NE had greater impacts to the aquatic ecosystem, and other significant environmental consequences over Transco's preferred site.

Lastly, the scope of the NJDEP's review of the impacts of the Project was appropriate given the clear language of the FWPA regulations. The NJDEP was not required under its regulations to analyze the impacts of NJNG's Southern Reliability Link ("SRL") project, and this Court should uphold the NJDEP's interpretation of its regulations.

Overall, the NJDEP's decision to issue the FWW Permit to Transco marked the culmination of over 20 months of review, the holding of two public hearings, the consideration of over 1800 written comments, and numerous requests from the NJDEP for additional supporting information from Transco. Through careful review of Transco's permit applications, and requests for minimization of impacts, the NJDEP's review resulted in a reduction of total impacts to wetlands from approximately 6.239 acres to 4.576 acres.

For these reasons, more fully discussed below, Petitioners' appeal should be dismissed.

## I.    THE NJDEP APPROPRIATELY DENIED BORDENTOWN'S REQUESTS FOR ADJUDICATORY HEARINGS

Despite this Court's precedential holding in *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.,* 833 F.3d 360 (3d Cir. 2016), which held that the NGA conferred original and exclusive jurisdiction over permits issued by the NJDEP pursuant to federal law to interstate natural gas pipeline companies, Petitioners claim that the NJDEP "abdicate[d] its responsibilities and refuse[d] to follow its own agency procedures" when it rejected Petitioners' requests for adjudicatory hearings. *See* Petitioners' Brief at 16. Specifically, Petitioners argue that the NGA requires final agency action before permits may be appealed to the federal courts of appeal, and that, in New Jersey, the permits are not final until after an adjudicatory hearing is held. *See* Petitioners' Brief at 21. However, the NJDEP's issuance of the permits to Transco were final decisions, and the NJDEP appropriately denied Bordentown's request for an adjudicatory hearing as this Court has original and exclusive jurisdiction over the issuance of these Permits.

As this Court has recently noted in a similar case brought pursuant to the NGA, "[o]ur cases have interpreted pragmatically the requirement of administrative finality, focusing on whether judicial review at the time will disrupt the administrative process." *Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.,* 870 F.3d 171, 176 (3d. Cir. 2017)(quoting *Bell v. New Jersey*, 461 U.S. 773, 779 (1983)). "Final

agency action must mark the consummation of the agency's decision making process, must not be of a merely tentative or interlocutory nature, and must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 176 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)(internal quotations omitted)).

Petitioners mistakenly rely on the holding of the United States Court of Appeals for the First Circuit in *Berkshire Envtl. Action Team, Inc. v. Tennessee Gas Pipeline Company, LLC*, 851 F.3d 105 (1st Cir. 2017). In that case the Court held that it lacked jurisdiction under the NGA, 15 U.S.C. §717r(d)(1), to hear the appeal of the issuance of a WQC to an interstate natural gas pipeline company since the Massachusetts Department of Environmental Protection ("MassDEP") had not yet issued a final order or action to grant or deny the WQC. As set forth in detail below, the administrative review process applicable to the NJDEP's issuance of a WQC is completely different than the process applicable to MassDEP and, therefore, the First Circuit's analysis has limited value here.

Importantly, Massachusetts regulations implementing the issuance of WQCs provide that "No activity may begin prior to the expiration of the appeal period or until a final decision is issued by [MassDEP] if an appeal is filed". 314 *CMR* 9.09(1)(e). To that end, a notice of claim for an adjudicatory hearing must be filed within 21 days of the issuance of the WQC. 314 *CMR* 9.10(1). As noted by the First Circuit, "When

a notice of claim is timely filed following the issuance of a water quality certification, the agency's review of the proposed project continues more or less as though no decision has been rendered at all." *Berkshire Envtl. Action Team, Inc. v. Tennessee Gas Pipeline Company, LLC*, 851 F.3d at 112.  In other words, the issuance of a WQC by MassDEP has no force or effect until, at the very earliest, the expiration of the 21-day appeal period.

On the other hand, the NJDEP's regulations on the issuance of FWW Permits and temporary dewatering permits clearly provide that the holder of these permits, such as Transco, has the authority to engage in the permitted activity, subject only to any applicable pre-construction conditions within the permit. *N.J.A.C.* 7:7A-21.3; *N.J.A.C.* 7:19-2.13.  Unlike MassDEP's decision, which has no force or effect until an adjudicatory hearing is held and a decision made, the NJDEP's issuance of the Permits authorized Transco to immediately perform the regulated activities regardless of whether or not a hearing request was filed.

The NJDEP's issuance of the Permits to Transco was clearly final decision requiring direct appeal to this Court.  As noted by the First Circuit, "finality 'is concerned with whether the initial decision maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury.'"  *Berkshire Envtl. Action Team, Inc.*, 851 F.3d at 110 (quoting *Darby v. Cisneros*, 509 U.S. 137, 144 (1993)).  The First Circuit further noted that the NGA does not express an intent by Congress for federal

courts of appeal "to exercise immediate review over such preliminary and numerous steps that state agencies may take in processing an application before they actually act in the more relevant  and consequential sense of granting or denying it." *Berkshire Envtl. Action Team, Inc.*, 851 F.3d at 108.  However, the NJDEP's issuance of the permits to Transco is not some preliminary step in the process, but is the culmination of almost 20 months of review resulting in the agency's final decision.  That decision, evidenced by the issuance of the Permits, has "relevant and consequential" implications for the parties.  Because NJDEP's issuance of the Permits to Transco authorized it to perform regulated activities without regard to the filing of an adjudicatory hearing request, Petitioners' sole avenue for appeal is through the filing of a Petition for Review with this Court.

Furthermore, requiring interstate pipeline companies to take part in an adjudicatory hearing would be directly at odds with Congress' intent in passing the Energy Policy Act of 2005 ("EPAct"), which amended the NGA to allow for original and exclusive jurisdiction in the Circuit Courts.  *See* 15 U.S.C. § 717r(d)(1).  As noted by the Court in *Tennessee Gas Pipeline Co. LLC v. Del. Riverkeeper Network*, 921 F. Supp.2d 381, 391-92 (M.D.Pa. 2013), the legislative history of the EPAct is reflective of Congress' intent "to cut out all [state] review after the original agency made its permitting decision."  *Id.* (citing, *inter alia*, statement of Mark Robinson, Director, Office of Energy Projects, FERC, observing that, prior to the enactment of the Energy

25

Policy Act of 2005 and its amendments to the rehearing and review procedures of the Natural Gas Act, applicants were subject to "a series of sequential *administrative . . . appeals* that [could] kill a project with a death by a thousand cuts just in terms of the time frames associated with going through all those appeal processes") (emphasis in original).

Thus, the state administrative review process set forth under the FWPA, and the temporary dewatering permit rules simply do not apply to the review of permits issued to interstate natural gas pipeline companies subject to regulation under the NGA.

## II. NJDEP COMPLIED WITH THE FWPA AND IMPLEMENTING REGULATIONS AND PROPERLY ISSUED THE FWW PERMIT

### A. NJDEP's Determination That the Project Was In The Public's Interest Was Proper Since the Project Was Certificated By FERC.

In determining whether to issue a FWW Permit, the NJDEP must make a determination as to whether the proposed regulated activity is in the public interest. *N.J.S.A.* 13:9B-11; *N.J.A.C.* 7:7A-10.2(b)12[2]. The FWPA rules provide seven factors that the NJDEP may consider when making the public interest determination:

---

[2] Formerly cited as *N.J.A.C.* 7:7A-7.2(b)12. The FWPA regulations were amended after the NJDEP issued the FWW Permit to Transco. These amendments became effective on December 18, 2017. Transco will cite to the amended regulations, as did the Petitioners, so as to avoid confusion. The amendments did not change the substance of the regulations relevant to this appeal.

i.      The public interest in preservation of natural resources and
        the interest of the property owners in reasonable economic
        development…

ii.     The relative extent of the public and private need for the
        proposed regulated activity;

iii.    Where there are unresolved conflicts as to resource use, the
        practicability of using reasonable alternative locations and
        methods, to accomplish the purpose of the proposed
        regulated activity;

iv.     The extent and permanence of the beneficial or detrimental
        effects which the proposed regulated activity may have on
        the public and private uses for which the property is suited;

v.      The quality and resource value classification pursuant to
        N.J.A.C. 7:7A-3.3 of the wetland, which may be affected
        and the amount of freshwater wetlands to be disturbed;

vi.     The economic value, both public and private, of the
        proposed regulated activity to the general area; and

vii.    The functions and values provided by the freshwater
        wetlands and probable individual and cumulative impacts of
        the regulated activity on public health and fish and wildlife;

*N.J.A.C.* 7:7A-10.2(b)12i-vii.  Petitioners claim, without even citing to the NJDEP's

public interest analysis, that the NJDEP failed to address these factors, and that factors

i, ii, and vi are not even mentioned.  *See* Petitioners' Brief at 25-26.

As an initial matter, FERC has exclusive jurisdiction over the determination of

whether a Project is in the public's interest.  *See Schneidewind v. ANR Pipeline Co.*,

485 U.S. 293, 300-301 (1988) (holding that where state regulation affects the ability of

the FERC to regulate interstate natural gas, the state regulation will be preempted). *See*

*also Islander East Pipeline v. Conn. Department of Environmental Protection*, 467

F.3d 295, 305 (2d Cir.2006) ("Congress wholly preempted and completely federalized

the area of natural gas regulation by enacting the NGA"). On April 6, 2016, FERC, after over a year of review, issued the Certificate Order for the Project. *See* 155 FERC ¶ 61,016. As a practical and legal matter, NJDEP had no choice but to accept FERC's determination concerning public interest or need. In doing so, NJDEP did not fail to consider the public interest requirement under the FWPA regulations. *See Hoosier Environmental Council v. U.S. Army Corps of Engineers*, 722 F.3d 1053, 1062 (7th Cir. 2013)(holding that the Army Corps of Engineers appropriately relied on the analysis of federal and state highway agencies in its own public interest analysis under Section 404 of the Clean Water Act). Thus, NJDEP appropriately considered the FERC's determination that the Project was in the public interest as reflected in its Review & Decision Summary. *See* JA, Vol. II, 411.

Even assuming that the NJDEP could not solely rely on the FERC's determination that the Project is in the public interest, the NJDEP appropriately considered each of the public interest factors set forth under the FWPA and implementing regulations.

As to the first factor, which deals with balancing of the public's interest in preservation of natural resources and the applicant's interest in reasonable economic development, the NJDEP found that the property "holds high economic value" for Transco, given its proximity to Transco's existing pipeline system. JA, Vol. II, 411. The NJDEP also found that the Project would economically benefit the public at large.

28

*Id.* As to the impacts on natural resources, the NJDEP found that the Project was designed to avoid impacts to forested wetlands, and that the Project would not adversely impact the functions of other wetlands onsite. *Id.*

As to the second factor, pertaining to the relative extent of the public and private need for the Project, the NJDEP noted that FERC issued the Certificate Order to Transco after determining that there was a need for the additional supply of natural gas. *See Id.* The NJDEP also explained that the Project would provide a secondary source of natural gas to southern and central New Jersey. *Id.*

In addressing the third factor, the NJDEP performed onsite inspections of the Project site on July 7, 2015 in connection with Transco application for a letter of interpretation. *See* JA, Vol. II, 389 (Response to Public Comments). In doing so, the NJDEP was able to determine the extent of regulated features on the Project site, and used this information in assessing options to minimize impacts onsite and in comparing the preferred site to alternatives locations. *See* JA, Vol. II, 406-409 (Review & Decision Summary)(assessing wetlands impacts at alternate sites).

The NJDEP also addressed the "extent and permanence of the beneficial or detrimental effects of the Project on public and private uses for which the propert[ies] [are] situated." *N.J.A.C.* 7:7A-10.2(b)12iv. The NJDEP considered both the temporary and permanent impacts of the Project, and, as a result of numerous discussions between Transco and the NJDEP, both permanent the temporary impacts

were substantially reduced to the greatest extent practicable. *See* JA, Vol. II, 405 (Review & Decision Summary).  The NJDEP found that the Project would have minimal impacts on existing uses and properties encumbered with Green Acres restrictions against diversion and disposal from recreation and conservation purposes, and concluded that the Project "is not expected to interfere with traffic, access to, or use of any adjacent properties, farms or schools." JA, Vol. II, 388 (Response to Public Comments).

Pursuant to the fifth factor, the NJDEP addressed the resource value classification of the impacted wetlands.  The NJDEP confirmed that, under the FWPA regulations, these wetlands are considered Intermediate Resource Value wetlands, and only require a 50-foot transition area.  JA, Vol. II, 411 (Review & Decision Summary). The NJDEP further found that Transco designed the Project to avoid impacting forested wetlands to the greatest extent practicable. *Id.*

As to the sixth factor, the NJDEP found that the Project would economically benefit the public at large by providing "a secondary supply of natural gas for southern and central New Jersey." *Id.*; *see Del. Riverkeeper Network v. Sec'y, Pa. Dep't of Envntl. Prot.,* 833 F.3d at 382 (holding that the NJDEP appropriately "found that the project would provide public and private economic value by expanding Transco's pipeline system capacity and serving end-users").

Lastly, the NJDEP thoroughly addressed the functions and values of the wetlands impacted by the Project, and any impacts on the public health and fish and wildlife. As noted by the NJDEP in its thorough Review and Decision Summary, the wetlands impacted by the Project are "modified agricultural wetlands and maintained herbaceous wetlands along existing utility right of ways." JA, Vol. II, 411. The NJDEP discussed at length its preference for impacts to these types of wetlands, over impacts to forested wetlands, especially given the increased ecological value of forested wetlands. JA, Vol. II, 407-408. The NJDEP noted that U.S. Fish and Wildlife Service reviewed the Project and confirmed that no critical habitat is present at the Project site. JA, Vol. II, 409. The NJDEP also noted that the New Jersey Division of Fish and Wildlife reviewed the Project and determined that there were no documented threatened or endangered species habitat. *Id.* As to the impacts on the public health, the NJDEP required Transco to provide information on the standard operating procedures for construction, maintenance and operation of the Project, and information pertaining to prevention of catastrophic events at Project facilities. *See* JA, Vol. II, 383 (Response to Comments document). The NJDEP appropriately considered this factor.

For the reasons set forth above, the NJDEP appropriately determined that the Project is in the public interest.

31

**B.     NJDEP Analyzed Alternative Sites For The Electrical Substation In Compliance With The FWPA And The Clean Water Act.**

Petitioners claim that NJDEP failed to adequately review "Alternate 15.2 NE", and allege that this alternate site constituted a practicable alternative for the location of the electrical substation.[3]  *See* Petitioners' Brief, pp. 26-29.  However, contrary to Petitioners' claim, the reason Alternate 15.2 NE was rejected was not because it was impracticable, but because it would have had greater environmental impacts compared to Transco's preferred location for the electrical substation.  *See* JA, Vol II, 407-408 (Review & Decision Summary).

The regulations implementing the FWPA, provide, in relevant part, that "[t]he Department shall issue an individual freshwater wetlands or open water fill permit only

---

[3] Petitioners incorrectly allege at various points in their brief that the NJDEP was required to "provide detailed, clear and convincing information *proving* impracticability." Petitioners' Brief at 28, 29 (emphasis in the Brief), citing *Utahns for Better Transp. v. U.S. Dept. of Transp*., 305 F.3d 1152, 1186 (10th Cir. 2002).  As the Tenth Circuit noted in *Utahns for Better Transp*, "[t]he test is whether the alternative with less wetlands impact is "impracticable," and the burden is on the Applicant [], with independent verification by the [U.S. Army Corps of Engineers], to provide detailed, clear and convincing information *proving* impracticability.  *Utahns for Better Transp. v. U.S. Dept. of Transp*., 305 F.3d at 1186.  Accordingly, the burden is on Transco, as the permit applicant, to clearly demonstrate a lack of practicable alternatives.  In turn, reviewing courts will look to whether the agency's finding that the applicant met its burden was "a clear error of judgment." s*ee Alliance For Legal Action v. U.S. Army Corps of Engineers*, 314 F.Supp.2d 534, 543 (M.D.N.C. 2004)(stating that "the court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that [the applicant] had done so was a clear error of judgment")

if the regulated activity...[h]as no practicable alternative which would…have a less adverse impact on the aquatic ecosystem or would not involve a freshwater wetland or State open water; and [t]he alternative would not have other significant adverse environmental consequences..." *N.J.A.C.* 7:7A-10.2(b)1[4]. An alternative is practicable "if it is available and capable of being carried out after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *N.J.A.C.* 7:7A-10.2(c)1[5]. Importantly, a practicable alternative may still be rejected by the NJDEP if it would have a greater impact on the aquatic ecosystem or other significant adverse environmental consequences. *See Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs.*, 869 F.3d 148, 162 (3d Cir. 2017)(upholding the Army Corps' rejection of a compression alternative for a pipeline project, although practicable, given the alternative's other significant environmental impacts).

Where, as here, the proposed activity is non-water dependent, there is a rebuttable presumption that there is a practicable alternative that would avoid freshwater wetlands or special aquatic sites, and have less of an impact on the aquatic ecosystem. *N.J.A.C.* 7:7A-10.3(b)[6]. In order to rebut the presumption, Transco must demonstrate, among other things, that the "basic project purpose cannot reasonably be accomplished using one or more other sites in the general region that would avoid or

---

[4] Formerly cited as *N.J.A.C.* 7:7A-7.2(b)1
[5] Formerly cited as *N.J.A.C.* 7:7A-7.2(c)1

reduce the adverse impact on an aquatic ecosystem." *N.J.A.C.* 7:7A-10.3(c)1[7].   As this Court has recently held, "'[t]his  does not require a specific level of detail to rebut the presumption, but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence.'" *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs.*, 869 F.3d at 163 (quoting *Hillsdale Environmental Loss Prevention Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1168 (10th Cir. 2012)).

As part of Transco's initial application to the NJDEP, Transco analyzed four alternative sites, in addition to the preferred site, for the location of the Project facilities. JA, Vol. II, 102. After over a year of review and back-and-forth between the NJDEP and Transco, the NJDEP determined, at the request of Petitioners and other members of the public, to hold a public hearing to solicit comments on Transco's permit application. The NJDEP ultimately held two public hearings in October of 2016 in Bordentown Township. *See* JA, Vol. II, 404 (Review & Decision Summary). Subsequent to the public hearings, the NJDEP issued a written request for additional supporting information pertaining not only to the initial four alternate sites, but also alternate sites for the electrical substation.  JA, Vol. II, 284 (November 17, 2016 Letter).  As noted by the NJDEP in that correspondence:

---

[6] Formerly cited as *N.J.A.C.* 7:7A-7.4(b)
[7] Formerly cited as *N.J.A.C.* 7:7A-7.4(c)3

> The largest single proposed impact to wetlands is the construction of the electrical substation component of the Project. Please investigate the possibility of separating the electrical substation from the remainder of the project and relocating it to a nearby upland.

> *Ibid.*

In response, Transco submitted additional supplemental information pertaining to alternate sites for the electrical substation on December 2, 2016 (JA 286), January 13, 2017 (JA 352), and February 3, 2017 (JA 361). Petitioners make a passing reference to the December 2nd letter, but, surprisingly, fail to even mention Transco's subsequent submittals on January 13th and February 3rd, which addressed Alternate 15.2 NE at length.

While Transco argued in its January 13th letter that cost and engineering constraints made Alternate 15.2 NE impracticable, it mainly argued that the location of the electrical substation on that site would have greater adverse impacts on the aquatic ecosystem and other significant environmental consequences over those attendant to Transco's proposed impacts on the preferred site. For instance, Transco determined through on-site inspections that a significant portion of Alternate 15.2 NE is covered in higher-quality forested wetlands, whereas Transco's preferred site contains mostly highly disturbed modified agricultural wetlands. JA, Vol. II, 354. Transco noted in its analysis that the forested wetlands on the Alternate 15.2 NE property have greater value over the herbaceous wetlands found on the preferred site as forested wetlands

35

provide for greater ground and surface water uptake and storage, and provide for greater habitat value to more varied types of wildlife. *Id*. at 356. Transco also noted that forested wetlands have greater value since it takes significantly more time to replace the functions and values that forested wetlands provide. *Id*. Whereas the replacement of herbaceous wetlands may take place over a matter of months, replacement of the functions of forested wetlands could take up to 50 years. *Id*.

Transco also pointed out that there would have been other significant environmental consequences associated with siting the electrical substation at Alternate 15.2 NE, including a significant amount of impacts to forested upland areas, and increased impacts resulting from the need to run the electrical duct bank from the substation to the compressor station. *Id*. Transco concluded that, while the total acreage of wetlands impacts associated with locating the electrical substation to Alternate 15.2 NE were slightly less than those associated with the preferred site, the ecological impact of locating the electrical substation at Alternate 15.2 NE would be greater due to the high functional value of the forested wetlands on that property. *Id*.

On January 26, 2017, the NJDEP and Transco completed an onsite meeting at Alternate 15.2 NE to review the wetlands present on the property. JA, Vol. II, 361. As a result of that meeting, the NJDEP requested that Transco further revise its design on the Alternate 15.2 NE property to shift the electrical substation footprint to avoid and minimize wetlands impacts. In response to this request, Transco submitted the

February 3, 2017 letter to provide further support for Transco's position that, even with shifting the footprint of the electrical substation, there would be significantly greater permanent impacts to higher quality forested wetlands.  JA, Vol. II, 363.

Ultimately, the NJDEP concurred with Transco's analysis, and concluded that construction of the electrical substation on the Alternate 15.2 NE property would have greater environmental impacts over the preferred site.  JA, Vol. II, 408 (Review & Decision Summary).  While the NJDEP acknowledged that the preferred site of the electrical substation had slightly greater impacts to wetlands, the NJDEP found that the alternate site would result in significantly greater impacts to forested wetlands, which the NJDEP stated were of a greater ecological value than the modified agricultural wetlands on the preferred site.  *Id.*

This substantial record evidence establishes that the NJDEP "took a hard look at the proposals and reached a meaningful conclusion based on the evidence."  *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs.*, 869 F.3d 148, 163 (3d Cir. 2017)(citation and internal quotations omitted).  For these reasons, this Court should uphold the NJDEP's rejection of Alternate 15.2 NE and finding that there were no practicable alternatives to the preferred site of the electrical substation "which would…have a less adverse impact on the aquatic ecosystem or would not involve a

freshwater wetland or State open water; and…would not have other significant adverse environmental consequences." *N.J.A.C.* 7:7A-10.2(b)1[8].

## III. THE NJDEP WAS UNDER NO LEGAL OBLIGATION TO CONSIDER THE CUMULATIVE ENVIRONMENTAL IMPACTS OF NJNG'S SRL PROJECT.

In addition to claiming that the NJDEP failed to analyze alternative sites for the Project, Petitioners also allege that the NJDEP improperly segmented its review of Transco's Project and NJNG's SRL Project, and that the NJDEP should have considered impacts on the Pinelands Area. However, as set forth in more detail below, the NJDEP complied with its regulations in issuing a FWW Individual Permit to Transco for regulated activity on Transco-owned property. Furthermore, Petitioners claims regarding impacts to the Pinelands Area should be dismissed since Transco's Project is neither in the Pinelands Area nor impacts a regulated feature within the Pinelands Area.

### A. The NJDEP Did Not Segment its Review of Transco's Project and the SRL

Petitioners argue in their brief that the NJDEP and Transco are attempting to circumvent the "letter and spirit of the FWPA" by segmenting review of the GSE and SRL projects, yet fail to actually set forth the text of the relevant regulation. The FWPA regulation prohibiting segmentation provides:

---

[8] Formerly cited as *N.J.A.C.* 7:7A-7.2(b)1

Each individual permit applies to the entire site upon which permitted activities occur. An applicant shall not segment a project or its impacts by applying for general permit authorization for one portion of the project and applying for an individual permit for another portion of the project. Similarly, an applicant shall not segment a project or its impacts by separately applying for individual permits for different portions of the same project.

*N.J.A.C.* 7:7A–10.1(c)[9].

The text of the regulation is important for understanding its scope. Here, an "individual permit applies to the entire <u>site</u> upon which permitted activities occur." *Ibid* (emphasis added). The term "site" is defined by the FWPA regulations to mean "the area within the legal boundary of the property(ies) or right-of-way…upon which a regulated activity is proposed, is occurring, or has occurred, plus any contiguous land owned or controlled by the same person(s)." *N.J.A.C.* 7:7A–1.3[10]. In other words, an individual permit only applies to regulated activity on property owned, or rights-of-way held, by the permit applicant. Conversely, the "site" would not include property not owned, or rights-of-way not held, by the applicant.

For the Project, the "site" includes those properties owned and rights-of-way held by Transco on which it proposed to perform activities regulated under the FWPA. Here, Transco owns in fee the three properties on which the electrical substation, compressor/M&R Station, and block valve are being constructed, and Transco holds

---

[9] Formerly cited as N.J.A.C. 7:7A–7.1(c)

easements across property owned by Bordentown and PSE&G.  Collectively, these properties constitute the "site" for purposes of the FWPA regulations, and Transco applied for a FWW Individual Permit that, once approved, would allow it to perform regulated activities on these properties.  Except for where the two projects are physically connected at the site of the compressor station/M&R station, Transco does not own property or hold easements that are crossed by the proposed route of the SRL.  Simply put, the properties used by Transco and NJNG for their respective projects do not meet the definition a single "site" under the FWPA regulations.  Accordingly, the NJDEP appropriately granted a FWW Individual Permit to Transco to conduct regulated activity on Transco's "site", as required by the FWPA regulations.

Moreover, Petitioners' allegation that the NJDEP's review violated the "spirit" of the FWPA regulations is simply an attempt to graft the definition of cumulative impacts under NEPA onto the state review process.  Specifically, Petitioners allege that Transco and NJNG's projects lack "independent utility", and therefore must be considered as one project.  *See* Petitioners' Brief at 33.  However, the FWPA regulations do not include an "independent utility" requirement when considering cumulative impacts.  In fact, the NJDEP addressed this point directly in its Response to Public Comments document, stating that "[i]n accordance with the [FWPA] Rules, the Department does not use "independent utility" to determine segmentation."  JA, Vol.

---

[10] Formerly cited as N.J.A.C. 7:7A–1.4

II, 384; s*ee Utahns for Better Transp.*, 305 F.3d at 1191 (noting that the Clean Water

Act Regulations define "cumulative impacts" in a different and narrower way than the

regulations implementing NEPA).  The FWPA regulations provide the standard for the

NJDEP to determine whether an applicant is segmenting a project to escape review,

and this Court should defer to the NJDEP's interpretation and reject Petitioners'

attempts to rewrite these regulations.  *See Del. Riverkeeper Network v. Sec'y, Pa. Dep't*

*of Envntl. Prot.*, 870 F.3d at 179-182 (deferring to the Pennsylvania Department of

Environmental Protection's interpretation of "water dependency" under Pennsylvania's

regulations as reasonable, and rejecting environmental group's attempt to have federal

law control the interpretation of that term).

### B.    The Environmental Impacts of the SRL are Irrelevant to the NJDEP's Review of Transco's Permit Application

At the end of their Brief, Petitioners provide a laundry list of environmental

impacts that they allege will result from the SRL Project, and claim, without any legal

support, that the NJDEP should have considered these impacts when reviewing

Transco's Project.  *See* Petitioners' Brief at 34-40 (alleging impacts to the Pinelands

Area, EPA listed Superfund Sites, and the Kirkwood-Cohansey aquifer system).

Petitioners do not allege, nor can they, that Transco's Project directly impacts these

resources.  Instead Petitioners make the sweeping claim that simply because the SRL

will be connected to Transco's Project, the NJDEP should have included these considerations in their review of Transco's permit application.

As set forth above, the FWPA regulations do not require the NJDEP to consider the environmental impacts of the SRL. Transco's Project and NJNG's SRL are entirely different projects proposed by two entirely different entities. Transco, as an interstate pipeline company, is subject to regulation by FERC and sought and received from the NJDEP an individual freshwater wetlands permit for its Project. NJNG, as an intrastate public utility, is subject to regulation by the New Jersey Board of Public Utilities and applied for its own permits in connection with the SRL.

Accordingly, the environmental impacts of the SRL are irrelevant to the NJDEP's analysis of Transco's Project.

## CONCLUSION

For the reasons set forth above, Transco respectfully asks that the Court dismiss Petitioners' appeal.

Respectfully submitted,
RUTTER, & ROY, LLP
Attorneys for Intervenor-Respondent,
Transcontinental Gas Pipe Line Company, LLC

Dated: March 28, 2018         By:   *s/Richard G. Scott*
                                    Richard G. Scott

## CERTIFICATE OF ADMISSION TO THE BAR

I hereby certify that Christine A. Roy, Esq and Richard G. Scott, Esq., attorneys for Intervenor-Respondent, are members in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  March 28, 2018

*s/Richard G. Scott*
Richard G. Scott, Esq.
NJ Bar No.:  030642010
Rutter & Roy, LLP
3 Paragon Way, Suite 300
Freehold, New Jersey 07728
Phone:  732-462-1990

### CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELATE PROCEDURE 32(A)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), contains 9742 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  March 28, 2018              *s/Richard G. Scott*
             Richard G. Scott, Esq.
             NJ Bar No.:  030642010
             Rutter & Roy, LLP
             3 Paragon Way, Suite 300
             Freehold, New Jersey 07728
             Phone:  732-462-1990

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE OF APPELLATE PROCEDURE 31.1(C)

This brief complies with the electronic filing requirements of L.A.R. 31.1(c) because:

1. The text of the electronic brief filed with the Court is identical to the text of the paper copies of the brief filed with the Court; and

2. The PDF file containing this brief electronically filed with the Court via the electronic filing system was scanned for viruses using Vipre Business Premium version 9.6.6194 and no virus was detected.

Dated:  March 28, 2018

*s/Richard G. Scott*
Richard G. Scott, Esq.
NJ Bar No.:  030642010
Rutter & Roy, LLP
3 Paragon Way, Suite 300
Freehold, New Jersey 07728
Phone:  732-462-1990

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2018, 7 (seven) hard copies of the foregoing were sent to the Clerk's Office.  Pursuant to Local Appellate Rules 31.1(d), I caused a copy of the foregoing to be served upon all counsel of record via CM/ECF with a hard copy sent by FedEx Overnight Delivery to the following:

> John C. Gillespie, Esq.
> PARKER McCAY P.A.
> 9000 Midlantic Drive, Suite 300
> Mount Laurel, New Jersey 08054
> Counsel for Chesterfield Township

> Jennifer Borek, Esq.
> Lawrence Bluestone, Esq.
> GENOVA BURNS LLC
> 30 Montgomery Street, 11th Floor Newark, New Jersey 07302
> Counsel for Township of Bordentown

> Paul Leodori, Esq.
> LAW OFFICES OF PAUL LEODORI
> 61 Union Street
> Medford, NJ 08055

> Ryan Atkinson, DAG
> 25 Market Street, P.O. Box 093
> Trenton, New Jersey 08625
> Counsel for the New Jersey Department of Environmental Protection

Dated:  March 28, 2018          *s/Richard G. Scott*
                               Richard G. Scott, Esq.
                               NJ Bar No.:  030642010
                               Rutter & Roy, LLP
                               3 Paragon Way, Suite 300
                               Freehold, New Jersey 07728
                               Phone:  732-462-1990

46

# ADDENDUM

## STATUTES,

## REGULATIONS AND

## FERC LETTER ORDERS,

## AND RESPONSE

## LETTER

# TABLE OF CONTENTS

                                                                    **Page**

***Federal Statutes***

5 *U.S.C.* § 706 (2)(A) …………………………………………….…...    T001


***State Regulations***

314 *CMR* 9.09(1)(e)…………………………………………………...    T003

314 *CMR* 9.10(1)…………………………………………………….    T005

*N.J.A.C.* 7:7A-1.3……………………………………………...….…    T008

*N.J.A.C.* 7:7A-10.1(c)...……………………………………….……    T011

*N.J.A.C.* 7:7A-21.3…………………………………………….……    T013

*N.J.A.C.* 7:13-5.5(a)………………………………………….……    T014

*N.J.A.C.* 7:19-2.13.…………………………………………..….…    T016


***FERC Letter Orders and Response Letter***

September 8, 2017 Letter Order…………………………………..…    T019

September 11, 2017 Letter from Transcontinental Gas Pipe Line

Company, LLC to FERC……………………………………………….    T021

March 16, 2018 Letter Order…………………………………………    T023

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedLimitation Recognized by Krafsur v. Davenport, 6th Cir.(Tenn.), Dec. 04, 2013

🚩 KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

  **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

  **(B)** contrary to constitutional right, power, privilege, or immunity;

  **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

  **(D)** without observance of procedure required by law;

  **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

  **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

Notes of Decisions (3889)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 115-132.

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Code of Massachusetts Regulations Currentness
Title 314: Division of Water Pollution Control
   Chapter 9.00: 401 Water Quality Certification for Discharge of Dredged or Fill Material, Dredging, and
   Dredged Material Disposal in Waters of the United States Within the Commonwealth (Refs & Annos)

314 CMR 9.09

9.09: 401 Water Quality Certification

(1) The Department will certify in writing to the appropriate federal agency and to the applicant whether or not the proposed project will meet applicable water quality standards and minimize environmental impacts through compliance with 314 CMR 4.00: *Massachusetts Surface Water Quality Standards* as implemented and supplemented by 314 CMR 9.00. Certification will be denied if the criteria of 314 CMR 9.06, 9.07, or 9.08 as applicable are not met The Department shall send copies of the 401 Water Quality Certification or denial concurrently to the conservation commission, any person who submits written comments during the public comment period and any others who submit a written request. The certification or denial will contain:

(a) the name and address of the applicant, the address of the proposed activity, and the date of the Department's determination;

(b) the federal permit number, the 401 Water Quality Certification Transmittal Number and the Wetlands Protection Act File Number, if applicable and available;

(c) a statement that there is or is not reasonable assurance that the activity will be conducted in a manner which will not violate applicable Surface Water Quality Standards at 314 CMR 4.00: *Massachusetts Surface Water Quality Standards* as implemented by 314 CMR 9.00 and a statement of reasons if certification is denied;

(d) any conditions deemed necessary by the Department to insure maintenance or attainment of water quality, minimization of any damage to the environment that may result from the project, or compliance with any applicable provisions of Massachusetts law that the Department is authorized to administer. As a condition of certification of subdivisions or other phased activities, applicants may be required to record a deed restriction which would limit subsequent discharges of dredged or fill material to ensure that the criteria for the evaluation of applications have been applied to a single and complete project, including all components of multi-phased activities;

(e) the date the work may begin. No activity may begin prior to the expiration of the appeal period or until a final decision is issued by the Department if an appeal is filed;

(f) a statement that the certification does not relieve the applicant of the duty to comply with any other statutes or regulations;

(g) notification of the right to request an adjudicatory hearing as described in 314 CMR 9.10; and

(h) where applicable, other state law determinations or approvals, including but not limited to a Chapter 91 dredging permit under 310 CMR 9.05(2) : *Activities Requiring a Permit Application.*

(2) Written applications may be made to amend existing, valid 401 Water Quality Certifications and are subject to the Department's review and approval or denial.

(3) Written applications may be made to extend an existing, valid 401 Water Quality Certifications and are subject to the Department's review and approval or denial.

(4) If the applicant has submitted a Combined Application, the Department may issue a Combined Permit that serves as two or three of the following: the 401 Water Quality Certification issued pursuant to 314 CMR 9.00; the Superseding Order of Conditions issued pursuant to 310 CMR 10.00: *Wetlands Protection;* and for a water-dependent use project, the Chapter 91 license, permit or other written approval issued pursuant to 310 CMR 9.00: *Waterways.* Alternatively, the Department may issue a 401 Water Quality Certification that is separate from the Order of Conditions issued pursuant to 310 CMR 10.00 and/or the Chapter 91 license, permit, or other written approval issued pursuant to 310 CMR 9.00.

Currency of the Update: The Massachusetts Administrative Code titles are current through Register No. 1359, dated February 23, 2018

Mass. Regs. Code tit. 314, § 9.09, 314 MA ADC 9.09

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.    T004    2

Code of Massachusetts Regulations Currentness
Title 314: Division of Water Pollution Control
Chapter 9.00: 401 Water Quality Certification for Discharge of Dredged or Fill Material, Dredging, and
Dredged Material Disposal in Waters of the United States Within the Commonwealth (Refs & Annos)

314 CMR 9.10

9.10: Appeals

(1) <u>Right to Appeal.</u> Certain persons shall have a right to request an adjudicatory hearing concerning certifications by the Department when an application is required:

    (a) the applicant or property owner,

    (b) any person aggrieved by the decision who has submitted written comments during the public comment period;

    (c) any ten persons of the Commonwealth pursuant to M.G.L. c. 30A where a group member has submitted written comments during the public comment period; and

    (d) any governmental body or private organization with a mandate to protect the environment that has submitted written comments during the public comment period.

Any person aggrieved, any ten persons of the Commonwealth, or a governmental body or private organization with a mandate to protect the environment may appeal without having submitted written comments during the public comment period only when the claim is based on new substantive issues arising from material changes to the scope or impact of the activity and not apparent at the time of public notice.

(2) <u>Notice of Claim.</u> Any notice of claim for an adjudicatory hearing must be accompanied by a filing fee as specified in 310 CMR 4.06: *Adjudicatory Hearing Filing Fee* and be sent by certified mail or hand delivered to the Department of Environmental Protection, postmarked within 21 days of the date of the certification.

(3) <u>Contents of Claim.</u> Any notice of claim for an adjudicatory hearing must include the following information:

    (a) the 401 Certification Transmittal Number and Wetlands Protection Act Number, the name of the applicant and address of the project;

    (b) the complete name, address, and telephone number of the party filing the request; the name, address and telephone number of any authorized representative; and, if claiming to be a person aggrieved, the specific facts that demonstrate that the party satisfies the definition of "aggrieved person" found in 314 CMR 9.02;

(c) a clear statement that an adjudicatory hearing is being requested;

(d) a clear and concise statement of facts which are grounds for the proceeding, the specific objections to the Department's written certification, and the relief sought through the adjudicatory hearing, including specifically the changes desired in the final written certification; and

(e) a statement that a copy of the request has been sent by certified mail or hand delivered to:

    1. the applicant;

    2. for projects in Outstanding Resource Waters, the public or private water supplier where the project is located, the Department of Conservation and Recreation for projects in Areas of Critical Environmental Concern, or other entity with responsibility for the resource;

    3. the owner, if different from the applicant;

    4. the appropriate regional office of the Department; and

    5. the conservation commission of the city or town where the activity will occur.

(4) <u>Coordination of Appeals.</u> The Department may coordinate adjudicatory appeals under 314 CMR 9.00, 310 CMR 10.00: *Wetlands Protection,* 310 CMR 9.00: *Waterways* or other administrative appeals.

    (a) If a final order has been issued pursuant to 310 CMR 10.00: *Wetlands Protection,* the Department may exclude issues solely within the jurisdiction of 310 CMR 10.00 at an adjudicatory hearing held under 314 CMR 9.00.

    (b) If a Chapter 91 license, permit or other approval has been issued pursuant to 310 CMR 9.00: *Waterways,* the Department may exclude issues solely within the jurisdiction of 310 CMR 9.00 at an adjudicatory hearing held under 314 CMR 9.00.

    (c) If an adjudicatory hearing has been requested under 314 CMR 9.00, 310 CMR 9.00: *Waterways,* 310 CMR 10.00: *Wetlands Protection,* or another administrative appeal, the Department may consolidate the proceedings.

    (d) In the event that the Department has issued a Combined Permit that serves as a 401 Water Quality Certification pursuant to 314 CMR 9.00, a Chapter 91 license, permit or other written approval issued pursuant to 310 CMR 9.00: *Waterways,* and/or a Superseding Order of Conditions issued pursuant to 310 CMR 10.00: *Wetlands Protection,* the appeal may include issues solely within the jurisdiction of 310 CMR 9.00 and 310 CMR 10.00 only as follows: The appeal may include issues within the jurisdiction of 310 CMR 9.00, only if the appeal has been requested in accordance with the requirements of 310 CMR 9.17: *Appeals.* The appeal may include issues solely within the

jurisdiction of 310 CMR 10.00, only if the appeal has been requested in accordance with the requirements of 310 CMR 10.05(7)(j).

Currency of the Update: The Massachusetts Administrative Code titles are current through Register No. 1359, dated February 23, 2018

Mass. Regs. Code tit. 314, § 9.10, 314 MA ADC 9.10

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  T007  3

New Jersey Administrative Code
    Title 7. Department of Environmental Protection
        Chapter 7A. Freshwater Wetlands Protection Act Rules (Refs & Annos)
            Subchapter 1. General Provisions (Refs & Annos)

N.J.A.C. 7:7A–1.3
Formerly cited as NJ ADC 7:7A–1.4

7:7A–1.3 Definitions

Currentness

The following words and terms, when used in this chapter, shall have the following meanings unless the context clearly indicates otherwise. Additional definitions specifically applicable to N.J.A.C. 7:7A-11, Mitigation, are set forth at N.J.A.C. 7:7A-11.1.

"Abandoned" means, with respect to an agricultural field, including a blueberry field or a cranberry bog, that the field was used for agriculture, but has not been used to produce a crop or product, or maintained or improved for agricultural purposes, for five years or more. If an agricultural field has been abandoned for 40 or more years, it shall no longer be considered an abandoned agricultural field. The lack of a commercial harvest or production of a crop on or from a cranberry bog or blueberry field shall not be a determining factor as to whether the agricultural use has been abandoned.

"Administratively complete" means that every item required on the application checklist for a letter of interpretation or permit being sought is included in the application.

"Agency of the State" means each of the principal departments in the executive branch of the State Government, and all boards, divisions, commissions, agencies, departments, councils, authorities, offices or officers within any such departments.

"Applicant" means a person who submits an application for a permit, waiver, or any other Department decision pursuant to N.J.A.C. 7:7A.

"Aquatic ecosystem" means waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals.

"Architectural survey" means an intensive-level historic architectural survey completed by an architectural historian whose qualifications meet the Secretary of the Interior's Professional Qualifications Standards and related guidance as part of the larger Secretary of the Interior's Standards and Guidelines for Archaeology and Historic Preservation as referenced in 36 CFR 61, as amended and supplemented, incorporated herein by reference.

"Atlantic white-cedar wetlands" means a type of forested freshwater wetlands where Atlantic white-cedar tree is the dominant vegetation, as described in the Federal Manual.

"Best Management Practices" or "BMPs" means methods, measures, designs, performance standards, maintenance procedures, and other management practices which prevent or reduce adverse impacts upon or pollution of freshwater wetlands, State open waters, and adjacent aquatic habitats, which facilitate compliance with the Federal Section 404(b) (1) guidelines (40 CFR Part 230), New Jersey Department of Environmental Protection Flood Hazard Area Control Act

"Public hearing" means an administrative non-adversarial type hearing before a representative or representatives of the Department providing the opportunity for public comment, but does not include cross-examination.

"Redevelopment" means the construction of structures or improvements on or below impervious surfaces, as defined in this section, or other significantly disturbed area.

"Regulated activity" means any of the activities described at N.J.A.C. 7:7A-2.2 or at N.J.A.C. 7:7A-2.3.

"Seeding" means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

"Silviculture" means the art and science of controlling the establishment, growth, composition, health, and quality of forests and woodlands to meet the diverse needs and values of landowners and society on a sustainable basis. The normal harvesting of forest products is a part of some silviculture operations. Orchards, tree farms and nurseries are not silviculture but are farming.

"Site" means the area within the legal boundary of the property(ies) or right-of-way for which a letter of interpretation is requested, or upon which a regulated activity is proposed, is occurring, or has occurred, plus any contiguous land owned or controlled by the same person(s). This term also includes an area which is the subject of an application for a letter of interpretation or which is the location of a proposed mitigation bank. For the purposes of this definition, the legal boundary of a property or right-of-way shall be the boundary as it existed on July 1, 1988 except that if additional contiguous lots and/or blocks were acquired after July 1, 1988, or if lots were merged after July 1, 1988, these lots are included in the site, and the legal boundary of the property or right-of-way shall be the boundary of all contiguous land owned or controlled by the same person(s), as it exists on the date an application is submitted under this chapter. The legal boundary of a property is set forth in the deed(s) for the property or other legally binding document that sets forth a boundary. The legal boundary of a right-of-way is set forth in the document creating the right-of-way.

"Site plan" or "plan" means a graphic depiction of land, vegetation, water, structures, and other physical features on paper, such as a blueprint, construction plan, cross-section, topographic map, architectural rendering, or other similar illustration, which is submitted to the Department to describe an existing or proposed activity or condition.

"Soil Conservation District" means a governmental subdivision of this State, and a public body corporate and politic, organized in accordance with N.J.S.A. 4:24-1 et seq. Each Soil Conservation District administers New Jersey Department of Agriculture programs for one or more counties. Soil Conservation Districts are overseen by the New Jersey State Soil Conservation Committee in the New Jersey Department of Agriculture, which promulgates the Standards for Soil Erosion and Sediment Control in New Jersey at N.J.A.C. 2:90. For the purposes of this chapter only, the term "Soil Conservation District" shall include any exempt municipality authorized to enforce the Standards for Soil Erosion and Sediment Control by ordinance pursuant to N.J.S.A. 4:24-48.

"Special aquatic site" means a site described in subpart E of the 404(b)1 guidelines (40 C.F.R. 230 et seq.), except freshwater wetlands which, for the purposes of this chapter, shall not be considered special aquatic sites. In general, special aquatic sites are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted functions and values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. As of September 4, 2001, the following special aquatic sites are described in subpart E of the 404(b)1 guidelines (40 C.F.R. 230 et seq.): sanctuaries and refuges, wetlands (note: while freshwater wetlands are excluded from the definition of a special aquatic site for purposes of this chapter, other wetlands, such as most coastal wetlands, would be considered special aquatic sites), mud flats, vegetated shallows, coral reefs, and riffle and pool complexes.

4. Artificial reflecting or swimming pools or other small ornamental bodies of water created by excavating and/or diking dry land to retain water for primarily aesthetic reasons;

5. Waterfilled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand, or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the above definition of "waters of the United States";

6. Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the CWA (other than cooling ponds); and

7. Erosional channels less than two feet wide and six inches deep in upland areas resulting from poor soil management practices.

"Working day" means a day on which the offices of the New Jersey Department of Environmental Protection are open for business.

**Credits**

Amended by R.1989 d.362, effective July 3, 1989; R.1992 d.117, effective March 16, 1992; R.1993 d.159, effective April 19, 1993; R.1993 d.646, effective December 20, 1993; R.1999 d.352, effective October 4, 1999; R.2001 d.312, effective September 4, 2001; R.2003 d.44, effective January 21, 2003; R.2007 d.243, effective August 20, 2007; R.2008 d.291, effective October 6, 2008; R.2009 d.372, effective December 21, 2009. Recodified from N.J.A.C. 7:7A-1.4 and amended by R.2017 d.243, effective December 18, 2017.

## CHAPTER EXPIRATION DATE

<Chapter 7A, Freshwater Wetlands Protection Act Rules, expires on August 5, 2022.>

Current through amendments included in the New Jersey Register, Volume 50, Issue 2, dated January 16, 2018.

7:7A–1.3, NJ ADC 7:7A–1.3

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Administrative Code
  Title 7. Department of Environmental Protection
    Chapter 7A. Freshwater Wetlands Protection Act Rules (Refs & Annos)
      Subchapter 10. Requirements for All Individual Freshwater Wetlands and Open Water Fill Permits (Refs & Annos)

N.J.A.C. 7:7A–10.1
Formerly cited as 7:7A–7.1

7:7A–10.1 General provisions for individual permits

Currentness

(a) A regulated activity or project subject to an individual permit shall meet the applicable requirements below:

1. Requirements for all individual permits at N.J.A.C. 7:7A-10.2;

2. For a non-water dependent activity, the requirements at N.J.A.C. 7:7A-10.3, except if the activity disturbs only State open waters that are not special aquatic sites; and

3. For a non-water dependent activity in an exceptional resource value wetland or trout production water, the requirements at N.J.A.C. 7:7A-10.4.

(b) The Department shall not consider a mitigation proposal in determining whether an individual permit will be issued for a project.

(c) Each individual permit applies to the entire site upon which permitted activities occur. An applicant shall not segment a project or its impacts by applying for general permit authorization for one portion of the project and applying for an individual permit for another portion of the project. Similarly, an applicant shall not segment a project or its impacts by separately applying for individual permits for different portions of the same project.

(d) In some cases, a regulated activity that requires an individual permit and is located in an area under the jurisdiction of the Pinelands Commission also requires approval by the Pinelands Commission, in accordance with the Pinelands Comprehensive Management Plan (CMP). For information on freshwater wetlands in the Pinelands, contact the Pinelands Commission at (609) 894–7300 or through its website at www.state.nj.us/pinelands.

**Credits**
Adopted by R.2001 d.312, effective September 4, 2001. Amended by R.2008 d.291, effective October 6, 2008. Recodified from N.J.A.C. 7:7A–7.1 and amended by R.2017 d.243, effective December 18, 2017.

**CHAPTER EXPIRATION DATE**

<Chapter 7A, Freshwater Wetlands Protection Act Rules, expires on August 5, 2022.>

Current through amendments included in the New Jersey Register, Volume 50, Issue 2, dated January 16, 2018.

7:7A–10.1, NJ ADC 7:7A–10.1

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

| |
|---|
| New Jersey Administrative Code |
|   Title 7. Department of Environmental Protection |
|     Chapter 7A. Freshwater Wetlands Protection Act Rules (Refs & Annos) |
|       Subchapter 21. Requests for Adjudicatory Hearings (Refs & Annos) |

N.J.A.C. 7:7A-21.3

7:7A-21.3 Effect of request for hearing on operation of permit or authorization

Currentness

(a) When a permittee requests an adjudicatory hearing to appeal any portion of a permit or an authorization, the operation of the permit or authorization shall be automatically stayed in its entirety, unless the permittee shows good cause in writing why the permit or authorization should continue in effect while being contested. All permitted activities shall stop as of the date the hearing request is submitted, and shall not be started again until the matter is resolved, unless the Department grants an exception in writing.

(b) When a person other than the permittee requests an adjudicatory hearing on a permit or authorization, the operation of the permit or authorization is not automatically stayed. The Department shall stay operation of the permit or authorization only if it determines that good cause to do so exists. If a stay is imposed, all permitted activities shall stop as of the date the stay is imposed, and shall not be started again until the matter is resolved, unless the Department grants an exception in writing.

**Credits**

Adopted by R.2017 d.243, effective December 18, 2017.

**CHAPTER EXPIRATION DATE**

<Chapter 7A, Freshwater Wetlands Protection Act Rules, expires on August 5, 2022.>

Current through amendments included in the New Jersey Register, Volume 50, Issue 2, dated January 16, 2018.

7:7A-21.3, NJ ADC 7:7A-21.3

---

End of Document      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.    T013   1

New Jersey Administrative Code
  Title 7. Department of Environmental Protection
    Chapter 13. Flood Hazard Area Control Act Rules (Refs & Annos)
      Subchapter 5. Verifications (Refs & Annos)

N.J.A.C. 7:13−5.5

7:13−5.5 When a verification is required for issuance of an
authorization under a general permit or an individual permit

Currentness

(a) Except as provided at (b) and (c) below, the flood hazard area design flood elevation, and floodway limit, where present, must be known and verified within the project area pursuant to N.J.A.C. 7:13-5.2 in order for the Department to determine compliance with the requirements of this chapter and issue an authorization under a general permit or an individual permit. An applicant for an authorization under a general permit or an individual permit shall therefore demonstrate that:

1. The applicant possesses a valid verification of the flood hazard area design flood elevation, and also the floodway limit, if present, for the project area;

2. The applicant has applied for a verification of the flood hazard area design flood elevation, and also the floodway limit, where present, for the project area, and the Department subsequently approves the verification either prior to or concurrent with the issuance of the authorization under a general permit or individual permit;

3. The project meets the conditions of (b)1, 2, or 3 below, in which case no verification is required in order to obtain an authorization under a general permit or an individual permit; or

4. The project meets the conditions of (c) below, in which case a verification of only the flood hazard area design flood elevation is required either prior to or concurrent with the issuance of an authorization under a general permit or an individual permit.

(b) Obtaining a verification is not required prior to the issuance of an authorization under a general permit or an individual permit, provided the Department determines, based on a visual inspection of submitted site plans and without a review of calculations, that one or more of the following requirements is satisfied:

1. No fill or aboveground structure is proposed within a flood hazard area;

2. The project consists solely of the construction, replacement, enlargement, repair, or removal of a bridge or culvert along a railroad or public roadway; or

3. All of the following are true:

i. No habitable building, railroad, roadway, or parking area is proposed, which requires knowledge of the flood hazard area design flood elevation to determine compliance with this chapter;

ii. Any proposed fill and/or aboveground structure is located outside a floodway; and

iii. The flood storage displacement requirements of N.J.A.C. 7:13-11.4 are satisfied.

(c) Obtaining a verification of only the flood hazard area design flood elevation and not the floodway limit is required prior to the issuance of an authorization under a general permit or an individual permit, provided the Department determines, based on a visual inspection of submitted site plans and without a review of calculations, that the following requirements are satisfied:

1. No fill or aboveground structure is proposed within a floodway; and

2. Compliance with the flood storage displacement requirements of N.J.A.C. 7:13-11.4 does not require knowledge of the location of the floodway.

**Credits**
Adopted by R.2016 d.055, effective June 20, 2016.

### CHAPTER EXPIRATION DATE

<Chapter 13, Flood Hazard Area Control Act Rules, expires on October 6, 2021.>

Current through amendments included in the New Jersey Register, Volume 50, Issue 2, dated January 16, 2018.

7:13–5.5, NJ ADC 7:13–5.5

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  T015  2

New Jersey Administrative Code
    Title 7. Department of Environmental Protection
        Chapter 19. Water Supply Allocation Permits (Refs & Annos)
            Subchapter 2. Permit and Water Use Registration Procedures; Permits–By–Rule

N.J.A.C. 7:19–2.13

7:19–2.13 Request for adjudicatory hearing

Currentness

(a) An applicant or any person, subject to the limitation on third party appeal rights set forth in P.L.1993, c. 359 (N.J.S.A. 52:4B–3.1 through 3.3), who believes himself or herself to be aggrieved, with respect to decisions made by the Department regarding any permit, permit condition, or application denial may contest the decision and request a contested case hearing pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq. and the New Jersey Uniform Administrative Procedure Rules N.J.A.C. 1:1, if the Department:

1. Denies an application for a water supply allocation permit, or any part thereof;

2. Revokes, withdraws or modifies a previously issued approval;

3. Denies a contract for the sale of water under N.J.A.C. 7:19–7; or

4. Issues a permit with conditions that the applicant considers unreasonable.

(b) Requests for a contested case hearing shall be submitted to:

Office of Legal Affairs

ATTENTION: Adjudicatory Hearing Requests

Department of Environmental Protection

CN 402

Trenton, New Jersey 08625–0402

(c) All requests for a contested case hearing must be received by the Department within 20 calendar days after the date upon which the notice of decision was received.

(d) All requests for a contested case hearing shall be submitted in writing to the Department and shall contain:

1. The name, address and telephone number of the person making such request;

2. A statement of the legal authority and jurisdiction under which the request for a hearing is made;

3. A brief and clear statement of specific facts describing the Department decision being appealed, as well as the nature and scope of the interest of the requester in such decision;

4. A statement of all facts alleged to be at issue and their relevance to the Department decision for which a hearing is requested. Any legal issues associated with the alleged facts at issue must also be included; and

5. In the case of a person who believes himself or herself to be aggrieved, the constitutional and statutory grounds entitling the person to a hearing and all documents supporting such assertions.

(e) A hearing request not received within 20 days after receipt of the notification by the applicant shall be denied by the Department.

(f) A hearing request based upon a permit condition which was contained in a prior permit held by the applicant and not objected to previously or on an issue not raised by the applicant during the public comment period shall be denied by the Department.

(g) A hearing request based upon a permit condition that the applicant requested in its application shall be denied by the Department.

(h) If the applicant or any person requesting a hearing pursuant to (a) above fails to include all the information required by (d) above, the Department may deny the hearing request.

(i) The Department shall determine whether any request for a contested case hearing should be granted. In making such determination, the Department shall evaluate the request to determine whether a contested case exists and whether there are issues of fact which, if assumed to be true, might change the Department's decision. Where only issues of law are raised by a request for a hearing, the request will be denied. Denial by the Department of a request for a contested case hearing shall constitute the final decision of the Department for the purposes of judicial appeal.

(j) The hearing if granted shall be held before an administrative law judge and in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq. and the rules and regulations promulgated thereto.

(k) If a permittee pursues a judicial appeal of the Department's final decision on the permit, the permit as issued shall remain in effect pending a decision on said appeal.

**Credits**
Amended by R.1990 d.180, effective March 19, 1990; R.1995 d.162, effective March 20, 1995.

## CHAPTER EXPIRATION DATE

<Chapter 19, Water Supply Allocation Permits, expires on January 23, 2021.>

Current through amendments included in the New Jersey Register, Volume 50, Issue 2, dated January 16, 2018.

7:19–2.13, NJ ADC 7:19–2.13

---

**End of Document**                                            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

In Reply Refer To:
OEP/DG2E/Gas 2
Transcontinental Gas Pipeline
    Company, LLC
Garden State Expansion Project
Docket No. CP15-89-000

September 8, 2017
Marg Camardello
Regulatory Analyst, Lead
Transcontinental Gas Pipe Line Company, LLC
2800 Post Oak Boulevard (77056)
PO Box 1396
Houston, TX 77251-1396

**Re: Authorization to Commence Service**

  I grant Transcontinental Gas Pipe line Company, LLC's (Transco) August 15, 2017 request, as supplemented on August 16 and September 8, 2017, to place into service Phase I facilities of the Garden State Expansion Project in Burlington and Mercer Counties, New Jersey. Your request is in compliance with condition number 9 of the Commission's April 7, 2016 *Order Issuing Certificate* (Order) issued in the above-referenced docket. This authorization is based on our review of Transco's recent construction status reports and our August 22, 2017 field inspection. We find that Transco has adequately stabilized areas disturbed by construction and that restoration is proceeding satisfactorily.

  I remind you that Transco must comply with all remaining terms and conditions of the Order. If you have any questions, please contact Nancy Fox-Fernandez at (202) 502-8559.

       Sincerely,

       J. Rich McGuire
       Director, Division of Gas-
       Environment & Engineering

cc:  Public File, Docket No. CP15-89-000

T019

Document Content(s)

CP15-89-000 SEPT 8 2017.DOCX......................................1-1

T020



**Transcontinental Gas Pipe Line Company, LLC**
2800 Post Oak Boulevard (77056)
P.O. Box 1396
Houston, Texas 77251-1396
713/215-2000


September 11, 2017


Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426


Attention:     Kimberly D. Bose, Secretary


Reference:     Transcontinental Gas Pipe Line Company, LLC
               Garden State Expansion Project
               Docket No. CP15-89-000
               Notification of Placement into Service of Phase 1


Ladies and Gentlemen:

On September 8, 2017, Transcontinental Gas Pipe Line Company, LLC ("Transco") received approval from the Federal Energy Regulatory Commission ("Commission") to place into service the facilities constructed under Phase 1 of the Garden State Expansion Project.  Pursuant to Section 157.20(c)(2) of the Commission's regulations under the Natural Gas Act, Transco hereby provides notice that the Garden State Expansion Project Phase 1 facilities were placed into service and commenced service on September 9, 2017.


Respectfully submitted,

TRANSCONTINENTAL GAS PIPE LINE
 COMPANY, LLC


By:  _____
          Marg Camardello
          Regulatory Analyst, Lead


T021

Document Content(s)

Transco_Garden State_In-Service_Notification_2017-0911.PDF............1-1

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

In Reply Refer To:
OEP/DG2E/Gas 2
Transcontinental Gas Pipeline
    Company, LLC
Garden State Expansion Project
Docket No. CP15-89-000

March 16, 2018

Marg Camardello
Regulatory Analyst, Lead
Transcontinental Gas Pipe Line Company, LLC
2800 Post Oak Boulevard (77056)
PO Box 1396
Houston, TX  77251-1396

**Re: Authorization to Commence Service, Phase 2**

    I grant Transcontinental Gas Pipe line Company, LLC's (Transco) March 9, 2018 request to place into service Phase 2 facilities of the Garden State Expansion Project in Burlington and Mercer Counties, New Jersey.  Your request is in compliance with condition number 9 of the Commission's April 7, 2016 *Order Issuing Certificate* (Order) issued in the above-referenced docket.  This authorization is based on our review of Transco's recent construction status reports and our February 6, 2018 field inspection.  We find that Transco has adequately stabilized areas disturbed by construction and that restoration is proceeding satisfactorily.

    I remind you that Transco must comply with all remaining terms and conditions of the Order.  If you have any questions, please contact Nancy Fox-Fernandez at (202) 502-8559.

                    Sincerely,


                    J. Rich McGuire
                    Director, Division of Gas-
                    Environment & Engineering

cc:    Public File, Docket No. CP15-89-000

T023

CP15-89 Phase 2 In-Service Authorization.PDF.........................1-1

T024